## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| GRACE HUDSON, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 02-2217 (RMC) |
| | ) | |
| DISTRICT OF COLUMBIA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Before the Court is Defendants' motion for partial judgment as a matter of law, a new trial, and a remittitur [Dkt. #85].  Because Plaintiffs failed to adduce adequate evidence from which a reasonably jury could conclude that Plaintiff Grace Hudson's emotional injury was sufficiently serious under D.C. law, judgment as a matter of law will be granted to Defendants on her claim for negligent infliction of emotional distress.  Defendants' motion will be denied in all other respects.

## I. FACTUAL BACKGROUND

This case arises out of an incident that led to the arrest of Plaintiff Karim Clayton on November 8, 2001.  Briefly recounted, shortly before midnight on November 7, Metropolitan Police Department ("MPD") Officer Richard Merritt and then–MPD Officer John Hackley observed a gathering of young adults in the 600 block of Keefer Street in Northwest Washington, D.C., just outside the residence of Mr. Clayton's grandmother, Ms. Hudson.  They exited their patrol wagon to investigate, and a dispute over who was the rightful owner of a Sony PlayStation ensued.  While the testimony about what happened next was not fully consistent, when viewed in the light most favorable to the Plaintiffs it established that Gad Doreus, a friend of Mr. Clayton's, intervened in the

dispute and was struck by Officer Merritt.  Mr. Clayton, who was watching events unfold from his grandmother's front porch, urged Mr. Doreus to retreat into the home for shelter from what he considered to be an unjustified beating.  The officers pursued Mr. Doreus onto Ms. Hudson's porch, where Officer Merritt struck Mr. Clayton several times with a metal baton before the two friends got into the house and secured the door behind them.

Intent on arresting the youths, the officers attempted to force open the front door.  As a result of the melee, Ms. Hudson, who was then 87 years old and had come downstairs to see what the ruckus was about, was accidentally knocked to the floor.  Mr. Doreus helped her to the living room sofa.  After the officers, then joined by backup, gained entry to the home, Officer Merritt encountered Mr. Clayton in the living room and struck him at least once with a metal baton, roughly three to four feet from where Ms. Hudson lay on the sofa.  Mr. Clayton then managed to move into the kitchen, where he was handcuffed and taken into custody.

Both Ms. Hudson and Mr. Clayton were taken to the hospital for medical treatment.  Ms. Hudson sustained a head injury in her fall and stayed in the hospital for eight days.  Mr. Clayton suffered a broken pinky finger and a lacerated forehead.  A forehead scar remained visible at trial.

Mr. Clayton was charged in D.C. Superior Court with simple assault and possession of a prohibited weapon.  He was acquitted of both charges in a bench trial.

Plaintiffs filed this action against Officer Merritt, former Officer Hackley, and the District of Columbia on November 8, 2002.  A jury trial commenced on August 23, 2005.  The jury found Officer Merritt liable to Mr. Clayton for assault and battery (Count II) and excessive use of force in violation of 42 U.S.C. § 1983 (Count III).  It also found in favor of Mr. Clayton on his false arrest (Count V) and malicious prosecution (Count VI) claims.  It found against Mr. Clayton on his

claim for intentional infliction of emotional distress (Count IV).[1]  The jury awarded Mr. Clayton a

total of $81,000 in compensatory damages and $15,000 in punitive damages.

Ms. Hudson's claim for negligent infliction of emotional distress (Count IV) was her

only claim to go to trial.[2]  The jury returned a verdict in her favor and awarded her $25,000 in

---

[1] Before trial, the Court granted summary judgment to Defendants on Mr. Clayton's claims of excessive force (Count I) and negligent infliction of emotional distress (Count IV).  These counts attempted to plead negligence claims indistinct from the alleged battery, and were thus infirm under *District of Columbia v. Chinn*, 839 A.2d 701 (D.C. 2003).  *See Hudson v. District of Columbia*, No. 02-2217, 2005 U.S. Dist. LEXIS 11505, at *11-17 (D.D.C. June 9, 2005).

[2] For the same reasons discussed in the preceding footnote, the Court also granted summary judgment to Defendants on Ms. Hudson's claims of excessive force (Count I) and negligent infliction of emotional distress (Count IV).  *See supra* n.1; *Hudson*, 2005 U.S. Dist. LEXIS 11505, at *11-17. The Court further granted summary judgment to Defendants on Ms. Hudson's § 1983 claim (Count III) because it was undisputed that she was not the intended object of the officers' actions, but rather an innocent bystander.  *See id.* at *8-11.

Defendants then moved *in limine* to dismiss Ms. Hudson's only remaining claims — those for assault and battery (Count II) and intentional infliction of emotional distress (Count IV).  *See* Defs.' Mot. in Limine [Dkt. #62].  Plaintiffs filed no response, and the motion was granted as conceded at the pretrial conference.  *See* Local Civ. R. 7(b).  At that conference, the following colloquy took place:

> THE COURT: This case is one in which the government file[d] a motion to dismiss . . . intentional infliction of emotional distress an[d] the plaintiffs filed no response.  The court therefore . . . grants the motion to dismiss [and] remove[s] from the litigation Ms. Hudson's claim of intentional infliction of emotional distress.
>
> MR. LATTIMER: I told you I concede that.
>
> THE COURT: Okay.  The government also file[d] a motion to dismiss Ms. Hudson's assault . . . and battery claims to which the plaintiff[s] file[d] no response. . . . So I'm granting that motion too because it has not been contested.

Provisional Transcript of the August 16, 2005, Pretrial Conference ("Pretrial Conf. Prov. Tr.") at 2:9-24; *see also id.* at 15:11-16 ("MR. LATTIMER: . . . I didn't respond to the last [defense motion] because I agree with the concept that based upon your [August 9, 2005,] ruling [Ms. Husdon] doesn't

compensatory damages.

A counter-claim by Officer Merritt and the District of Columbia against Mr. Clayton for assault and battery was also submitted to the jury. The jury found in favor of Mr. Clayton. In so finding, the jury presumably rejected the officers' testimony that Mr. Clayton, in trying to help Mr. Doreus and avoid his own arrest, struck Officer Merritt with a 10-pound weight and a piece of wood, both allegedly launched from inside the home.

---

have a claim for intentional infliction of emotional distress."). Several days later — on the first day of trial — Plaintiffs' counsel moved the Court "to reconsider its determination that battery requires an intentional touching" and to allow Ms. Hudson's battery claim to go forward. Pls.' Mot. for Reconsid. at 1 [Dkt. #72]. This, of course, was not the basis on which Ms. Hudson's battery claim was dismissed; as detailed above, it was dismissed as conceded based on counsel's failure to oppose Defendants' motion *in limine*.

Plaintiffs also moved the Court "to reconsider the dismissal of [Ms. Husdon's] claim for negligent infliction of emotional distress." *See* Pls.' Mot. for Reconsid. at 1 [Dkt. #65]. In that motion, counsel argued: "In dismissing this claim, the Court on Tuesday, August 16, 2005, reasoned that because [her] claim in this regard was 'premised' on Count I of her complaint, which the Court dismissed, this claim too must be dismissed as well [sic]." *Id.* Counsel was mistaken in thinking that the Court dismissed Ms. Hudson's negligent infliction claim during the pretrial conference; that claim was quite clearly dismissed months earlier in the Court's June 9, 2005, opinion. *Hudson*, 2005 U.S. Dist. LEXIS 11505, at *17 ("[S]ummary judgment must also be granted on Count IV's allegation of Negligent Infliction of Emotional Distress."); *id.* at 20 ("Summary judgment for Defendants will be granted for . . . the negligence component of Count IV (Negligent Infliction of Emotional Distress)."); Pretrial Conf. Prov. Tr. at 17:8-10 ("[I]t's very clear that the order in June dismissed or granted summary judgment to the [D]istrict as to count four['s] allegation of negligent infliction of emotional distress."). Nevertheless, this motion prompted the Court to reconsider its June 9 ruling on Ms. Hudson's negligence (Count I) and negligent infliction (Count IV) claims. Prov. Tr. at 1:4–2:19 (afternoon of Aug. 22, 2005). On reconsideration, the Court found that Ms. Hudson still could not proceed on her negligence claim because she had "failed to proffer expert testimony regarding the standard of care to which [MPD] officer[s] are required to adhere under the circumstances." *Id.* at 1:21-23; *see, e.g.*, *Smith v. District of Columbia*, 882 A.2d 778, 793 (D.C. 2005) (requiring a plaintiff to present a "basis independent of excessive force" and "expert testimony as to the applicable standard of care" to maintain a negligence claim). Persuaded, however, that D.C. case law did not foreclose Ms. Hudson from pursuing a negligent infliction claim on the basis of bystander liability, *see District of Columbia v. Evans*, 644 A.2d 1008, 1018 (D.C. 1994), the Court allowed that claim to go forward. *Id.* at 2:3-13.

4

Defendants Officer Merritt and the District of Columbia[3] now move, pursuant to Federal Rule of Civil Procedure 50, for judgment as a matter of law as to four claims: Ms. Hudson's claim for negligent infliction of emotional distress (Count IV), and Mr. Clayton's false arrest, malicious prosecution, and § 1983 claims (Counts V, VI, and III, respectively).  In the alternative, Defendants move, pursuant to Federal Rule of Civil Procedure 59, for a new trial on all claims submitted to the jury — with the exception of Ms. Hudson's negligent infliction claim, which they ask the Court to leave undisturbed in the event that it denies their motion for judgment as a matter of law.  Defs.' Notice of Withdrawal at 1 [Dkt. #109].  As a final alternative, Defendants move the Court to remit Mr. Clayton's damages for false arrest.

## II. LEGAL STANDARDS

### A. Motion for Judgment as a Matter of Law

Federal Rule of Civil Procedure 50 permits the Court to grant a motion for judgment as a matter of law if "a party has been fully heard on an [essential] issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."  Fed. R. Civ. P. 50(a)(1).  Where, as here, "the court does not grant a motion for judgment as a matter of law made

---

[3] Former Officer Hackley, a defendant at trial, is not a movant here.  The District contends that "the jury found for Defendant Hackley on all claims."  Defs.' Mem. at 4.  Plaintiffs disagree. While conceding that the jury did not find former Officer Hackley liable for assault and battery (Count II) or excessive force under § 1983 (Count III), or for punitive damages on any claim, the Plaintiffs argue that both officers are liable for false arrest (Count V) and malicious prosecution (Count VI) because the verdict form did not distinguish between them on the issues of liability (questions 5 and 7) or compensatory damages (question 17), though it did on the issue of punitive damages (questions 19-20).  *See* Pls.' Opp'n at 2-3 n.1; Verdict Form [Dkt. #78].  Thus, Plaintiffs submit that, because the District is vicariously liable for the actions of former Officer Hackley, who did not file a post-trial motion, the District's challenges to the verdict with regard to liability for malicious prosecution and false arrest are moot.  *Id.*  The Court agrees.

at the close of all of the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b). A defendant seeking judgment as a matter of law under Rule 50 must demonstrate that "the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not have reached a verdict in plaintiff's favor." *McGull v. Munoz*, 203 F.3d 843, 845 (D.C. Cir. 2000) (internal quotation marks omitted).  "In making that determination, a court may not assess the credibility of witnesses or weigh the evidence," *Hayman v. Nat'l Academy of Sciences*, 23 F.3d 535, 537 (D.C. Cir. 1994), nor may it "substitute its judgment for that of the jury," *Bodoo v. Cary*, 21 F.3d 1157, 1161 (D.C. Cir. 1994).  The evidence must be viewed in the light most favorable to the non-moving party and all conflicts must be resolved in that party's favor.  *Mackey v. United States*, 8 F.3d 826, 829 (D.C. Cir. 1993).  In sum, the "jury's verdict must stand unless the evidence, together with all inferences that can reasonably be drawn therefrom[,] is so one-sided that reasonable men could not disagree on the verdict." *Carter v. Duncan-Huggins Ltd.*, 727 F.2d 1225, 1227 (D.C. Cir. 1984).

### B.  Motion for New Trial

Federal Rule of Civil Procedure 59 provides: "A new trial may be granted . . . in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R. Civ. P. 59(a).  "Discretion to grant a new trial has generally been understood to include actions rendering the trial unfair." *Sparshott v. Feld Entm't Inc.*, 311 F.3d 425, 433 (D.C. Cir. 2002).  This Court has noted that a new trial should be granted "if the verdict is against the weight of the evidence, damages are excessive, for other reasons the trial was not fair, or substantial errors occurred in the admission or

rejection of evidence or the giving or refusal of instructions." *Nyman v. FDIC*, 967 F. Supp. 1562, 1569 (D.D.C. 1997) (citing 11 C. Wright, A. Miller & Cooper, Federal Practice and Procedure § 2805 (1973)).  Although the standard under Rule 59 is "less onerous" than under Rule 50, *id.* (citing *Lewis v. Elliott*, 628 F. Supp. 512, 516 (D.D.C. 1986)), a Rule 59 motion should generally be granted "only where the court is convinced that the jury verdict was a 'seriously erroneous result' and where denial of the motion will result in a 'clear miscarriage of justice,'" *Sedgwick v. Giant Food Inc.*, 110 F.R.D. 175, 176 (D.D.C. 1986) (quoting *Chedd-Angier Prod. Co. v. Omni Publ'n Int'l*, 756 F.2d 930, 934 (1st Cir. 1985)).

### C. Motion for Remittitur

A remittitur is appropriate only when the jury's verdict is "beyond all reason, or . . . is so great as to shock the conscience," or is "so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." *Jeffries v. Potomac Dev. Corp.*, 822 F.2d 87, 96 (D.C. Cir. 1987) (internal quotation marks omitted; omission in original).  The D.C. Circuit permits remittitur "only if the reduction permits recovery of the highest amount the jury tolerably could have awarded." *Langevine v. District of Columbia*, 106 F.3d 1018, 1024 (D.C. Cir. 1997).  It has further instructed that courts be "especially hesitant to disturb a jury's determination of damages in cases involving intangible and non-economic injuries." *Id.*

### III. DISCUSSION

### A. Motion for Judgment as a Matter of Law

Defendants move for judgment as a matter of law as to four claims: Ms. Hudson's claim for negligent infliction of emotional distress (Count IV), and Mr. Clayton's false arrest, malicious prosecution, and § 1983 claims (Counts V, VI, and III, respectively).

### 1. Ms. Hudson's Claim for Negligent Infliction of Emotional Distress

Defendants argue that they are entitled to judgment as a matter of law as to Ms. Hudson's negligent infliction claim for three reasons: (1) she failed to introduce evidence of a standard of care that was breached by the officers; (2) she failed to present evidence that she was in the "zone of danger"; and (3) she failed to adduce evidence of an emotional injury that is "serious" and verifiable."  Pls.' Mem. at 26-31.  Because the last argument disposes of the issue, the Court need not address the other two.

"In a negligent infliction case, there can be recovery for mental and emotional distress only if the plaintiff's injuries are serious and verifiable."  *Bahura v. S.E.W. Investors*, 754 A.2d 928, 937 (D.C. 2000) (internal quotation marks omitted).  Here, the Court instructed the jury that emotional distress is serious "only if it results in long-term physical symptoms that amount to physical illness, or long-term mental disturbance that can be classified as an illness in and of itself." Jury Instr. at 44 [Dkt. #112].  It instructed the jury that emotional distress is verifiable "if there is evidence to demonstrate that the illness is not feigned, fabricated, or imagined."  *Id.*  These rules serve to exclude recovery for "trifling distress," *Williams v. Baker*, 572 A.2d 1062, 1068 (D.C. 1990); *Jones v. Howard Univ. Inc.*, 589 A.2d 419, 424 (D.C. 1991), and generally preclude recovery for symptoms that are "transitory, non-recurring, or inconsequential."  *Bahura*, 754 A.2d at 938.

Because Ms. Hudson was left with no triable claim for assault and battery or intentional infliction of emotional distress, *see supra* n.2, her recovery was limited to "any emotional distress she may have suffered specifically from witnessing the alleged beating of Mr. Clayton," Jury Instr. at 44.  Defendants submit that the only evidence of Ms. Hudson's emotional distress was her own testimony that she was "concerned" about her grandson, Mr. Clayton.  They also argue that she

presented no verifiable evidence of distress.  Defs.' Mem. at 31.  Plaintiffs limply counter that Ms.

Hudson also testified that she was "apprehensive," "afraid," and "worried" about her grandson and

herself.  Pls.' Mem. at 14-15.  Rather than relying on the characterizations of counsel, the Court

looks to the record.  Ms. Hudson's relevant trial testimony was as follows:

> Q. At the time that [the officer] was hitting Karim what was going
> through your mind?
>
> A. I was, I was afraid that he was going to hurt him.  And I was afraid
> that, I was just afraid for him.

Trial Tr. at 18:22-25 (Aug. 24, 2005).

> A. I didn't see Karim after I got to the hospital.  We seem like we
> went our separate ways.
>
> Q. How did that make you feel?
>
> A. I was just apprehensive.
>
> Q. Why?
>
> A. Because I didn't know whether he was still bleeding or what.  I
> was worried about him.
>
> Q. How long was it before you got an opportunity to see him again?
>
> . . . .
>
> A. I don't think I saw him for about two days.
>
> Q. And during that two day period how did it make you feel or what
> were you feeling?
>
> A. I was feeling apprehensive about him and I was wondering how he
> was doing and besides I was worried about myself and the sore was
> in my head [sic] and I was, all in all I was just worried about him and
> also myself.

*Id.* at 20:11–21:3.

Q. How did [coming home from the hospital] make you feel?

. . . .

A. I was feeling despondent and look like [sic] I was just ready to cry, but I was trying to, trying not to get too upset.

Q. What about that was making you upset? . . . .

A. Because I didn't have anything to do with anything.  I was inside of my home, in my bed.  I didn't see why I had to have my place torn up . . . .

*Id.* at 26:13-22.

Q. How did [seeing Karim again] make you feel?

A. It made me feel better because I could see that he was like on his way to recovery.  His head was still, he still had the gash in his head and he had a splint like on his finger, on his finger, you know, and wrapped.

. . . .

Q. Before you got to see him, did you know what his condition was?

A. No, I did not.

Q. How did that make you feel?

A. I was apprehensive until I saw him.  After I saw him I felt better.

Q. Okay.  Now how has seeing Karim beaten in your home [a]ffected you?

A. I don't, I don't seem like I want him there as much as I use to have him there because it look like it's, I'm tense because it's always so many police around my house or coming up my street and I'm tense. I rather for him to stay [sic] with his mother and not come see me like he use to.

*Id.* at 29:7–30:6.  Other trial testimony established that Ms. Hudson saw Officer Merritt hit her grandson at least once with a metal rod, from a distance of roughly three to four feet.  She also rode with him in the ambulance to the hospital; during this ride the wound on his forehead was bleeding. Once they arrived at the hospital, the two were separated.  They saw each other again two days later and, for unknown reasons, not again until Ms. Hudson returned home from her 8-day hospital stay.

During this time, Ms. Hudson was understandably "apprehensive," "afraid," and "worried" about her grandson, as she testified.  But the Court finds no evidence — and Plaintiffs' counsel point to none — that these feelings manifested themselves as *physical* symptoms.  And there is simply no evidence of the type of long-term *mental* disturbance that can be characterized as "serious" emotional distress.  Rather, these feelings, though arising from lamentable circumstances, are not of sufficient duration or severity to be considered serious under District of Columbia law. *Bahura*, 754 A.2d at 937-38; *Williams*, 572 A.2d at 1068; *Jones*, 589 A.2d at 424.  The Court must therefore grant Defendants' motion for judgment as a matter of law as to Ms. Hudson's claim for negligent infliction of emotional distress.

### 2. Mr. Clayton's False Arrest and Malicious Prosecution Claims

Defendants next argue that they are entitled to judgment as a matter of law on Mr. Clayton's false arrest and malicious prosecution claims "because, as a matter of law, there was probable cause to arrest" him.  Pls.' Mem. at 16.  Of course, probable cause is a valid defense to a claim of false arrest, *Magwood v. Giddings*, 672 A.2d 1083, 1086 (D.C. 1996), or malicious prosecution, *Weisman v. Middleton*, 390 A.2d 996, 1002 (D.C. 1978), and the Court so instructed the jury, Jury Instr. at 36, 42.  At Defendants' request, the Court also instructed the jury on the elements of two "potential crimes" that may have given rise to probable cause: simple assault and

11

resisting arrest.  *Id.* at 38.  Defendants' present motion focuses solely on the latter crime.[4]  The

relevant statute provides:

> Whoever without justifiable and excusable cause, assaults, resists, opposes, impedes, intimidates, or interferes with a law enforcement officer on account of, or while that law enforcement officer is engaged in the performance of his or her official duties shall be guilty of a misdemeanor and, upon conviction, shall be imprisoned not more than 180 days or fined not more than $1,000, or both.

D.C. Code Ann. § 22-405(b) (2007) (formerly § 22-505).  A separate subsection further provides:

> It is neither justifiable nor excusable cause for a person to use force to resist an arrest when such an arrest is made by an individual he or she has reason to believe is a law enforcement officer, whether or not such arrest is lawful.

*Id.* § 22-405(d).

Defendants insist that Mr. Clayton's own testimony established the existence of

probable cause to arrest him for interfering with the arrest of Mr. Doreus and resisting his own arrest.

They characterize that testimony as follows:

> Based on Mr. Clayton's testimony alone, it is clear that Mr. Clayton knew that uniformed officers had arrived in a marked MPD vehicle, that they had had an exchange with Mr. Doreus, that one of the officers had struck Mr. Doreus, and that the police had then chased Mr. Doreus onto Ms. Hudson's porch at Mr. Clayton's behest.  Mr. Clayton admitted that he could not hear the verbal exchange between Officer Merritt and Mr. Doreus, because he was on the porch at the time.  He also admitted that he could not see whether Mr. Doreus had kicked Officer Merritt, as Officer Merritt testified.  Regardless of

---

[4] In their reply brief, Defendants argue — to the Court's recollection, for the first time — that there was also probable cause to arrest Mr. Clayton for failing to obey the lawful order of a police officer. Pls.' Reply at 19.  "When Officer Merrit pushed Mr. Clayton aside as he was pursuing Mr. Doreus, he was ordering" — implicitly, the Court surmises — "Mr. Clayton to stop interfering."  *Id.* Because this argument was not raised until Plaintiffs' reply brief, the Court declines to address it. *See, e.g.*, *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 835 (D.C. Cir. 2001) (arguments first raised in reply brief are ordinarily waived).

> these issues, it cannot be disputed that Mr. Clayton knew, when he
> first got in the officer's way and then opened the door and pulled Mr.
> Doreus into the house, that he was acting to aid Mr. Doreus' escape
> from the police.

Pls.' Mem. at 17-18.  Defendants further argue that allowing Mr. Clayton to recover under these

circumstances would be contrary to public policy, for it would encourage "untrained and uninformed

citizens — who believe the police are using excessive force when they draw their weapons, apply

handcuffs, or take any other action to subdue or restrain an arrestee — . . . to intercede[,] placing

themselves and the officers at greater risk."  *Id.* at 19.  In sum, Defendants submit:

> [O]n the street, it is the police that make the decision whether to
> arrest someone.  Regardless of the merits, passersby are not permitted
> to second-guess these decisions.  If they do, and decide to interfere,
> they commit an arrestable offense.

*Id.* at 20.  Whatever the appeal of this argument as a matter of policy, it is undermined by the text

of the statute, which plainly prohibits resisting arrest or interfering with the arrest of another

"without justifiable and excusable cause."  D.C. Code § 22-405(b).  Although it is "neither justifiable

nor excusable cause" to use *force* to resist an arrest, even if the arrest is unlawful, the statute does

not prohibit the use of *other* means, when justified, to resist arrest.  *See id.* at § 22-405(d).

At trial, Defendants presented evidence from which the jury might have concluded

that Mr. Clayton had no justifiable cause to assist Mr. Doreus in escaping from the officers and that

he threw a piece of wood, like a javelin, at them from inside the house and thus used force against

the officers.  Plaintiffs presented evidence from which the jury might have concluded that Mr.

Clayton had justifiable or excusable cause to interfere and that Mr. Clayton did not use force against

the officers.[5]  These are quintessential fact issues for the jury, and the evidence was not "so one-sided that reasonable men could not disagree." *Carter*, 727 F.2d at 1227.  Defendants' motion for judgment as a matter of law will be denied as to these claims.

### 3. Mr. Clayton's § 1983 Claim

Defendants next argue that they are entitled to judgment as a matter of law on Mr. Clayton's § 1983 claim because Officer Merritt's use of force against Mr. Clayton did not violate a right that was "clearly established" at the time of the incident.  Defs.' Mem. at 23.  Defendants characterize the relevant right as the right under D.C. Code § 22-405 to interfere peaceably with the arrest of another when it appears that the arrest is being effected with excessive force.  *See id.* at 23-25.  Such a right, they submit, was not clearly established at the time of Mr. Clayton's 2001 arrest.  This argument misses the point.

The questions whether Officer Merritt could properly arrest Mr. Clayton for a violation of § 22-405 and whether Officer Merritt used excessive force in violation of § 1983 in effecting that arrest are distinct.  Assuming *arguendo* that Mr. Clayton was properly subject to arrest, the question is whether, in executing that arrest, Officer Merritt violated Mr. Clayton's Fourth Amendment right to be free from an unreasonable seizure due to excessive force.  In other words, were the amount and type of force used by Officer Merritt objectively reasonable in light of the facts

---

[5] Defendants' argument that Mr. Clayton "used force" when he pulled Mr. Doreus into the house and closed the front door misses the mark.  Pls.' Mem. at 18.  In the context of § 22-405, which proscribes assaults on the police, "force" means force used against an officer, not upon a person justifiably saved from an officer.  The defense theory at trial was that Mr. Clayton threw a piece of wood at the officers from inside the house, which struck Officer Merritt.  Had the jury credited Defendants' testimony in that regard, it would presumably have found that Mr. Clayton impermissibly used force to avoid arrest — and, perhaps, found Mr. Clayton liable to Officer Merritt for battery.  Given the verdict, it is obvious that the jury did not credit the testimony.

and circumstances confronting him?  *See Graham v. Connor*, 490 U.S. 386, 397 (1989).

In the qualified immunity context, it is not enough to say that Officer Merritt — indeed, any officer — knows that, as a general matter, the "use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  The purpose of qualified immunity is to protect an officer from the "sometimes hazy border between excessive and acceptable force," shielding him from liability when he "reasonably misapprehends the law governing the circumstances [he] confronted." *Id.* (citations and internal quotation marks omitted).  Thus, for an officer to be subject to liability under § 1983, the right he is alleged to have violated must have been "clearly established" in a more "particularized" sense, taking into account the specific facts and circumstances the officer confronted.  *Id.* at 198-99.

Here, neither party offers a helpful description of the "particularized" situation that Officer Merritt confronted.  Viewing the events from the perspective of Officer Merritt, but construing the facts, as it must, in the light most favorable to Plaintiffs, *see id.* at 196 & n.2, the Court would describe the situation Officer Merritt confronted as follows: Whether to arrest a bystander — who attempted, without using force, to help a friend avoid an unjustified beating at the hands of the police — by forcing his way into the bystander's home, where the bystander and his friend were sheltered, and repeatedly striking the bystander with a metal baton, causing a broken finger and a laceration to the forehead.  *See id.*  It would have been clear to any reasonable officer that this course of conduct was unlawful.

To be sure, these were not the only inferences available to the jury, but the Court cannot say that the evidence was so one-sided that this version of the facts is unsupported.  With due

regard for the jury's role in making credibility determinations, and viewing the facts in the light most favorable to Plaintiffs, the Court concludes that Officer Merritt is not entitled to qualified immunity from Mr. Clayton's § 1983 claim.

## B. Motion for New Trial

Defendants argue that they are entitled to a new trial for two reasons: (1) references to Officer Merritt's disciplinary proceedings before an MPD trial board were made in violation of Federal Rule of Evidence 404(b); and (2) Audrey Price was improperly allowed to testify as a rebuttal witness for Plaintiffs.

### 1. Rule 404(b)

Defendants' primary Rule 404(b) argument arises out of the following exchange that took place during Plaintiffs' cross-examination of Officer Merritt:

Q [by Mr. Lattimer]. . . . Before we go any further, is it fair to say that you have issues with anger?

A. No.

Q. Would it be fair to say that you have issues with your veracity?

A. No, no more than anyone else.

MR. ANDERSON: I object unless there's some good faith belief that he can give a positive answer to these questions.

MR. LATTIMER: We're getting there.

THE COURT: Well, let us proceed.  If there's no support for the questions, then we can direct the jury.

BY MR. LATTIMER:
Q. Now haven't you in fact been disciplined for those things? . . .

MR. ANDERSON: . . . I object.  I don't know what he is talking

about.  I think we should take a proffer at the bench, and then [see] if
he has some evidence because it's very prejudicial to imply stuff that
he can't prove.

[Bench conference omitted.]

BY MR. LATTIMER:
Q. Officer Merritt, I was asking you isn't it true that you were brought
up on charges based upon actions that you took relative to a female
at a club?

A. Yes.

Q. And didn't that involve accusations of you having taken physical
actions against her?

A. They were accusations.

Q. And you had a trial board about that didn't you?

A. Yes.

Q. And at the trial board those accusations were sustained were they
not?

MR. ANDERSON: Objection, Your Honor.

THE COURT: This is cross examination.  This is legitimate cross
examination.  Continue, Mr. Lattimer.

BY MR. LATTIMER:
Q. Were they not?

A. No, not all.

Q. Some of them were?

A. Just, just the acts unbecoming.

Q. Acts unbecoming of a police officer?

A. Right.

Q. How many?

A. One.

Q. Just one?

A. One.  It covered the whole, covered the whole thing.  That one statement, that one acts unbecoming covers the whole thing.

Q. Just one, nothing about false reports?

A. No, not that I can remember.

Q. And nothing about your use, your improper use of force?

A. Not that I can remember that, no.

Q. Now you indicated that you were new to the area when you went out to Keefer Place, right?

A. As far as patrol, yes.

Q. And that was because you had been off for a while?

A. Yes.

Q. And that was because of what had happened with those charges, right?

A. Correct.

Trial Tr. 103:5–115:8 (Aug. 25, 2005).

During the bench conference — omitted from the above due to its length — the Court responded to Defendants' request for a proffer by pressing Plaintiffs' counsel to demonstrate that he had a good-faith basis for inquiring whether Officer Merritt had anger or veracity issues.  After a good deal of hand wringing, Plaintiffs' counsel proffered that an MPD trial board had investigated Officer Merritt concerning an altercation with a woman at a nightclub and found him guilty of

18

"beating up a woman" and "filing false reports." *Id.* 108:22-24. Counsel further proffered that although the trial board recommended termination, the matter was referred to arbitration and the penalty was ultimately reduced to a year's suspension. *Id.* at 109:2-6; 112:21– 113:4. Counsel added that Officer Merritt had refused to discuss the reasons for his suspension during his deposition. *Id.* at 109:11–111:10. Satisfied that the issues were "relevant to [Officer Merritt's] testimony and credibility," *id.* at 112:2-3, and that Plaintiffs' counsel had articulated a good-faith basis for inquiring, *id.* at 113:5-6, the Court allowed the cross-examination to proceed.

"The Federal Rules of Evidence require that an objection to evidence state 'the specific ground of objection, if the specific ground was not apparent from the context.'" *United States v. David*, 96 F.3d 1477, 1480 (D.C. Cir. 1996) (citing Fed. R. Evid. 103(a)(1)). Although counsel need not provide "a pinpoint citation to a provision of the Rules or relevant precedent for every objection," the Rules do require that counsel provide "enough specificity to alert the district court and opposing counsel to the basis for the objection." *Id.* At no time during the bench conference — which comprises nine pages of transcript, Trial Tr. at 104-113 (Aug. 25, 2005) — did Defendants specifically raise a Rule 404(b) objection. The Court agrees that they once flirted with the idea, at one point asking: "Is this evidence of prior misconduct to show on this particular date that he is []consistent? That's not allowed by the rules." *Id.* at 105:11-13. Given the context, however, this lone remark was insufficient to alert the Court that Defendants intended to raise a Rule 404(b) objection. The lengthy bench conference was prompted by Defendants' clear challenge to Plaintiffs' basis for inquiring about the disciplinary board proceedings. *Id.* 103:12-14 ("MR. ANDERSON: I object unless there's some good faith belief that [Officer Merritt] can give a positive answer to these questions."). A careful review of the transcript reveals that resolving that objection

remained its singular focus.  Defendants simply failed to make a timely, specific objection on Rule 404(b) grounds.

In any event, even had Defendants timely objected on Rule 404(b) grounds, the Court would have permitted Plaintiffs to proceed.  Whether Officer Merritt filed false police reports ineluctably bears on his character for truthfulness and was therefore a proper subject of cross-examination under Rule 608(b).  And Officer Merritt's one-year suspension (if not the nature of the underlying charges) was admissible for non-propensity purposes under Rule 404(b) to demonstrate that Officer Merritt had a motive to fabricate his trial testimony.  While Mr. Clayton and Ms. Hudson testified that Officer Merritt struck Mr. Clayton with a metal baton, *see, e.g.*, Trial Tr. 12:18-19 (Aug. 24, 2005) (Clayton); Trial Tr. 17:17-20 (Aug. 24, 2005) (Hudson), the defense claimed that former Officer Hackley used the baton while Officer Merritt, who was not trained to use the baton, struck Mr. Clayton with a police radio, *see, e.g.*, Trial Tr. 16:18-20, 19:10-11 (Aug. 29, 2005) (Merritt); Trial Tr. 88:23–89:5 (Aug. 29, 2005) (Hackley).  Plaintiffs supported their version of events by arguing that Officer Merritt could not admit to having used a baton because, due to his recent suspension, he was not certified to use one — if he had, he would have been subject to further discipline.  *See, e.g.*, Trial Tr. 19:10-24 (Aug. 29, 2005) (Merritt) (agreeing that he didn't have a baton because he wasn't certified due to his suspension, and testifying that there "would have been a lot of problems" had he, in fact, used one during the incident).

Thus, while there is no doubt that the evidence of Officer Merritt's suspension was somewhat damaging, it was not unfairly prejudicial.  The evidence was admissible not for propensity purposes, but to demonstrate that Officer Merritt had a motive to lie, and the way in which Plaintiffs used that evidence to attack his credibility was appropriate.

As a second string to their bow, Defendants direct a Rule 404(b) argument toward a portion of Defendants' closing argument, which they claim made an improper propensity argument based on Officer Merritt's disciplinary record.  In closing, Plaintiffs emphasized the conflicting testimony about the source of Mr. Clayton's injuries discussed above.  In arguing that Officer Merritt was not to be believed, Plaintiffs' counsel stated:

> If [Officer Merritt] in fact hit somebody with a [baton] he, as he told you, would have had problems because he wasn't certified. Because before coming back and getting on that beat, he had been suspended for a year for misconduct.
> Let me tell you something.  You're not a bad cop on Monday and a good cop on Tuesday.  It don't work like that.  If you were a bad cop on Monday, you're a bad cop on Tuesday.  You're a bad cop on Wednesday, you're a bad cop on Thursday, and you're a bad cop on Friday.  You may not get caught on Tuesday, Wednesday, Thursday, and Friday, but you are a bad cop nevertheless.
> And you know from Officer Merritt himself, that he was a bad cop.  And Officer Merritt can't change and become a good cop overnight.  Good cops don't get, good cops don't get suspended from work.
>
> MR. ANDERSON: Objection, Your Honor.  This is arguing from past misconduct that there is a future inclination for that which is our objection to the original evidence and it's a continuation.
>
> THE COURT: I think you just made that point.  Why don't you just move on.
>
> MR. LATTIMER: Officer Merritt and Officer Hackley didn't tell you the truth, haven't told you the truth, and won't tell you the truth.

Trial Tr. 93:16–94:14 (Aug. 31, 2005).

Defendants did not raise the issue again until the next day — after their own closing argument, Plaintiffs' rebuttal, and the Court's final instructions to the jury had been given.  Before releasing the jury to deliberate, the Court asked counsel whether they wished any other instructions

to be given to they jury.  At that point, Defendants' counsel asked to approach regarding "a couple

things that I wanted to ask."  Trial Tr. 39:18-22 (Sept. 1, 2005).  The first issue, concerning certain

stipulations, is not relevant here.  Regarding the second issue, Defendants' counsel said:

> I just wanted to make a record because we still have problems with
> Mr. Lattimer's argument yesterday that the cop is a bad cop on day
> one, day two.
>
> THE COURT: That you can make after I excuse the jury.
>
> MR. ANDERSON: Oh, okay.
>
> THE COURT: Since you have identified here, you can expand on that
> after the jury goes.
>
> MR. ANDERSON: Then we could incorporate our prior objections
> during the colloquy yesterday[?]
>
> THE COURT: That's fine.  Okay.

*Id.* at 41:8-19.  After the jury was excused to begin its deliberations, the following discussion took

place:

> THE COURT: And Mr. Anderson wanted to make a record on the
> point that he wanted to expand upon his objection.
>
> MR. ANDERSON: Yeah, my objection and then I think sometimes
> I have seen cases where they suggest where you have to request a
> curative instruction.
>       So the objection is that Mr. Lattimer made an argument that
> I don't think is allowed under the rules of evidence as propensity, that
> he's claiming that the officer had a propensity to be violent and to lie.
>       I don't think there was a factual basis for that and I don't think
> that's a permissible argument and so, and I objected when it happened
> but then sometimes I have seen these cases and they suggest well,
> they should request a curative instruction.  If you don't maybe you
> waive that.  That's the two things that I wanted to say about that.
>
> THE COURT: Well, I wish you had said curative instruction before
> I released the jury.  I think it's too late for a curative instruction.

22

MR. ANDERSON: Oh, okay.  I'm not sure if I did or not.

THE COURT: I don't believe you mentioned anything about a curative instruction.  I thought you wanted to expand on your objection so that the record would be clear in case you wanted to make that point for appeal.

MR. ANDERSON: Right.  And I don't know whether the transcript showed.  I meant to ask for a curative instruction, maybe I didn't say that word.

THE COURT: I don't think that, I don't think you did, but I do think it gets a little confusing because what Mr. Lattimer was doing was suggesting in a sort of generic terms that bad officer on Monday was a bad officer on Tuesday is a bad officer on Wednesday.
        When you made your objection, I sustained it and told him to move on and change his approach and he did.
        I agree with you that you can't use past bad acts as propensity evidence for current bad acts.  That's why I sustained the objection.

MR. ANDERSON: I'm not sure you really sustained it.  I think you may have said move on.

THE COURT: Well, all right.  I told him to move on but it amounted to sustained and I understood exactly what you were doing and why you were doing it and I told him to move on and cease the reference and he did.
        So I think to the extent that it was subject to being addressed as soon as you made your objection, it was addressed[,] and I don't recall the request for a curative instruction prior to the time that the jury retired to deliberate.
        So I don't think that I can give them such an instruction now without giving it unduly.

MR. ANDERSON: Very well.

*Id.* at 44:2–46:1.  The record indicates that although the Court did not state that Defendants' objection was "sustained," the Court's directing Plaintiffs' counsel to "move on" made it reasonably clear to the jury that the argument was improper.  And Plaintiffs' counsel quickly switched course, focusing pointedly on the officers' character for truthfulness.

The record also makes clear that Defendants made no request for a curative instruction until after the jury had retired to deliberate. Counsel had ample opportunity to do so. Evidence of Officer Merritt's disciplinary record was first introduced on the third day of trial. On the sixth day of trial, the parties and the Court discussed final jury instructions at length before closing arguments. Trial Tr. 3:2–6:7, 46:1–80:13 (Aug. 31, 2005). There was further discussion about instructions after closing arguments — and after Defendants' objection — that afternoon. *Id.* at 147:1-24. And the next morning, immediately before charging the jury, the Court gave the parties a final opportunity to raise any issues. Trial Tr. 2:1-10 (Sept. 1, 2005). When counsel finally requested a curative instruction after the jury had retired, little could be done — recalling the jury for that purpose would have given any curative instruction undue emphasis.

Finally, Defendants insist that the Court erred in failing to strike what they consider to be misstatements of evidence about Officer Merritt's trial board proceedings made by Plaintiffs' counsel during closing argument, and argue that the Court compounded that error by endorsing the misstatements. The transcript shows that, during closing argument, Plaintiffs' counsel stated that Officer Merritt was "suspended for a year" for "making a false statement." Defendants objected for lack of foundation, and the Court responded, "I think that's close to what the evidence was." Plaintiffs' counsel then added that the suspension was also for using "inappropriate force on a woman outside a nightclub." Defendants again objected for lack of foundation, and moved to strike both remarks. The Court overruled the objection. Trial Tr. 88:1-17 (Aug. 31, 2005).

The evidentiary basis for Plaintiffs' characterizations of Officer Merritt's disciplinary record appears above. *See supra* at 16-18. On cross-examination, Officer Merritt admitted that he had been brought before a trial board on charges arising from a physical altercation with a woman

at a nightclub.  When questioned whether charges for "improper use of force" and "false reports" were sustained, he responded: "No, not that I can remember."  He did admit that one charge, for conduct unbecoming a police officer, was sustained.  He also indicated that there were other charges that were not sustained. Trial Tr. 114:4-12 (Aug. 25, 2005) ("Q. And at the trial board those accusations were sustained were they not? . . . A. No, not all.").  He further testified that the charge sustained "covered the whole, covered the whole thing.  That one statement, that one acts unbecoming covers the whole thing." *Id.* at 114:20-21.  Although the matter is hardly clear, owing in part to Officer Merritt's obvious reluctance to discuss his disciplinary record, the Court thinks that his testimony fairly gives rise to the inference that the "conduct unbecoming" charge that triggered his suspension was based on an improper use of force and making a false statement of some sort.

### 2. Rebuttal Testimony of Ms. Trice

Finally, Defendants argue that Plaintiffs were allowed to offer improper rebuttal testimony when they called Audrey Trice, who was not listed as a witness in their pretrial statement or identified in any of the Plaintiffs' discovery responses. Defs.' Mem. at 13-14.  Because Ms. Trice was an occupant of an automobile parked on Keefer Street who testified that she saw the entire event transpire, Defendants argue that her testimony was not intended to "'meet something new, which was brought out by the defendant, and which could not have been anticipated by the plaintiff.'" *George Wash. Univ. v. Lawson*, 745 A.2d 323, 327 (D.C. 2000) (quoting *Berry v. Littlefield, Alvord & Co.*, 296 F. 285, 286 (D.C. Cir. 1924)).  They assert that they were not prepared for Ms. Trice's testimony and were not given any additional time to "cope with this unwarranted surprise." Defs.' Mem. at 15. Plaintiffs respond that, as a practical matter, they could not list Ms. Trice as a witness because Mr. Clayton knew her only as "Nikki" and was unaware of her full name, and was thus unable to contact

25

her until Mr. Doreus testified.  They also suggest that Defendants' claim of unfair surprise is disingenuous.

Rebuttal evidence is generally appropriate only when "it is offered in response to evidence first presented to the court during the defendant's case." *Heatherly v. Zimmerman*, No. 92-7050, 1993 U.S. App. LEXIS 33334, at *4 (D.C. Cir. Dec. 10, 1993) (unpublished) (citing *Morgan v. Commercial Union Assurance Cos.*, 606 F.2d 554, 555 (5th Cir. 1979)).  However, a trial court has "wide discretion in respect to the order of proof," *Lawson*, 745 A.2d at 327 (citing *Cahan v. Cokas*, 181 A.2d 342 (D.C. 1962)), including the decision "whether to admit testimony in rebuttal," *id.* (citing *Adkins v. Morton*, 494 A.2d 652, 663 (D.C. 1985)).

Here, Defendants promptly objected when Ms. Price testified that she was in a position to observe the incident from the start.  The Court overruled the objection because, at that point, it remained unclear what, exactly, the subject of Ms. Price's testimony would be.  Trial Tr. 18:2–20:14 (Aug. 31, 2005).  With the benefit of hindsight, it now appears that her testimony covered much the same ground as that of Messrs. Clayton and Doreus and, in that sense, might properly have been presented in Plaintiffs' case-in-chief.  But while it surely bolstered their testimony, it also squarely refuted certain testimony presented by Officer Merritt and former Officer Hackley in support of Officer Merritt's counter-claim.

Moreover, it appears that both sides were well aware that Ms. Price was a witness to the events on the evening in question.  Ms. Price testified at Mr. Clayton's bench trial in Superior Court — and Defendants' counsel had a transcript of her testimony on hand when Ms. Price was called to testify here and used that transcript in an attempt to impeach her.  Tr. 34:1-12 (Aug. 31, 2005).  Defendants' counsel also made the point that Ms. Price — who was in the car with a

26

girlfriend who happens to be the mother of Mr. Doreus's child — might not have been an entirely disinterested witness. *Id.* at 27:-20–28:12.

   In short, the Court is not persuaded that Ms. Price was an improper rebuttal witness or that Defendants were surprised or prejudiced by her testimony.

* * * * *

   Upon careful review, the arguments advanced to justify a new trial are largely *post hoc* spin that misconstrue the record and the nature of the objections that were fairly raised during trial.  At bottom, Defendants are dissatisfied with the jury's verdict and place blame on the Court's evidentiary rulings.  That is what appeals are for.  If there were errors, they cannot be said to have lead to a "seriously erroneous result" or a "clear miscarriage of justice" warranting a new trial. *Sedgwick*, 110 F.R.D. at 176.

### C. Motion for Remittitur

   The jury awarded Mr. Clayton $27,000 in compensatory damages for false arrest. Defendants argue that there is no basis for such an award because (1) the jury presumably compensated Mr. Clayton for his physical injuries in their award for his assault and battery and § 1983 claims; (2) Mr. Clayton repudiated any recovery for "emotional damages" to avoid the defense's attempt to mitigate damages by introducing his prior arrest record, *see* Pls.' Opp'n to Defs.' 2d Mot. in Limine at 4 [Dkt. #71]; and (3) Mr. Clayton submitted no evidence of lost wages or medical bills.  Defs,' Mem. at 31-32.  Accordingly, Defendants urge the Court to remit his damages for false arrest to the nominal amount of $1.

A remittitur is appropriate only if the reduction gives to the plaintiff the highest amount the jury tolerably could have awarded, and the Court must be especially wary of disturbing a jury's findings where intangible and non-economic injuries are at issue. *Langevine*, 106 F.3d at 1024. Here, the jury was directed to a list of recoverable damages for all of Mr. Clayton's claims, including "any inconvenience the plaintiff has experienced" and "any inconvenience the plaintiff may experience in the future," in addition to physical injuries, the effects of physical injuries, past and future pain caused by the incident, and any humiliation or embarrassment associated with any disfigurement or deformity. Given this range of possibilities, and the obvious care with which the jury awarded damages, the Court can find nothing excessive about the damages awarded in this case — they certainly do not "shock the conscience." *Jeffries*, 822 F.2d at 96. Defendants' motion for a remittitur will therefore be denied.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Defendants' motion for partial judgment as a matter of law, a new trial, and a remittitur [Dkt. #85]. Specifically, the Court will grant judgment as a matter of law to Defendants on Ms. Hudson's claim for negligent infliction of emotional distress, and will vacate the jury's award of $25,000 in compensatory damages for that claim. Defendants' motion will be denied in all other respects.

A memorializing order accompanies this Memorandum Opinion.

Date: April 2, 2007                                    /s/
                                    ROSEMARY M. COLLYER
                                    United States District Judge